UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCHENVISKY JAMES #155610,

                Petitioner,                                Hon. Paul L. Maloney

v.                                              Case No. 4:01-CV-98

CONNIE HORTON,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on James' petition for writ of habeas corpus.   In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that James' petition be **denied**.

## BACKGROUND

As a result of events occurring on or about January 1, 1996, Petitioner was charged with the second degree murder of Al Kendrick and possession of a firearm during the commission of a felony.   (ECF No. 189-4 at PageID.820-21).   Several people testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Lawrence Poole**

Poole was a brother to Al Kendrick.   (ECF No. 189-4 at PageID.925).   On January 9, 1996, Poole identified Kendrick's body at the morgue.   (*Id.*).   At the time of his death, Kendrick was approximately five feet, eleven inches tall and weighed approximately 160 pounds. (*Id.*).

**Marlene Irby**

As of January 1, 1996, Kendrick and Irby shared a residence and had been in a relationship for approximately three years.   (ECF No. 189-4 at PageID.926-27).   Petitioner and Kendrick were friends.   (*Id.* at PageID.928).   Petitioner owned a house on Commonwealth Street.   (*Id.* at PageID.927).   Kendrick used crack cocaine and would often go to Petitioner's Commonwealth Street house to use drugs.   (*Id.* at PageID.928-29).   On January 1, 1996, Kendrick went to Petitioner's Commonwealth Street house several times.   (*Id.* at PageID.929-37).   Irby last saw Kendrick at approximately 11:30 p.m. on January 1, 1996, when Kendrick departed for Petitioner's Commonwealth Street house.   (*Id.* at PageID.937).

**Lanning Davidson**

As of January 9, 1996, Davidson was employed as a Wayne County Assistant Medical Examiner.   (ECF No. 189-4 at PageID.945-46).   On this date, Davidson performed an autopsy of Al Kendrick's body.   (*Id.* at PageID.946-51).   Davidson determined that Kendrick died as a result "of a single gunshot wound to the head" fired from a weapon which had been "held straight in front of Mr. Kendrick['s] forehead when his fatal injury occurred."   (*Id.* at PageID.950-51).   Moreover, because "there was no evidence of close range firing" of the fatal shot, Davidson ruled out suicide as the cause of Kendrick's death.   (*Id.* at PageID.951).

**Deborah Sanders**

As of January 1, 1996, Sanders had recently moved into the house Petitioner owned at 5985 Commonwealth.   (ECF No. 189-4 at PageID.958-59).   Sanders earned the money to pay her rent, in part, by "engag[ing] in acts of prostitution."   (*Id.* at PageID.959-60).   A man named Joe also resided at 5985 Commonwealth.   (*Id.* at PageID.961).   Joe's "unspoken job" was "to be

the man of the house. . .because there were only women living at the house." (*Id.*).  Joe was responsible for making sure that "no danger came to" any of the women living at the house.  (*Id.*).

On January 1, 1996, Al Kendrick was present at 5985 Commonwealth.  (*Id.* at PageID.960-61).  At some point that evening, Kendrick began fighting with Joe.  (*Id.* at PageID.964-69).  Petitioner entered the residence a few minutes later at which point the fight between Joe and Kendrick ceased.  (*Id.* at PageID.969-70).  Petitioner asked, "what the fuck is going on?' in response to which Kendrick stated "something to the effect of let me explain or like, you know."  (*Id.* at PageID.971).  Kendrick did not threaten Petitioner, but Petitioner nonetheless drew a gun and shot Kendrick.  (*Id.* at PageID.971-78).  Kendrick's body was then removed from the house.  (*Id.* at PageID.976).

**George Sullivan**

Sullivan, also known as Joe, often provided "security" for Petitioner at 5985 Commonwealth.  (ECF No. 189-5 at PageID.1012-14).  Sullivan encountered Al Kendrick at 5985 Commonwealth on the afternoon of January 1, 1996.  (*Id.* at PageID.1014-15).  Later that evening, Kendrick departed to buy beer.  (*Id.* at PageID.1015-16).  When Kendrick returned, he began attacking Sullivan and screaming "why are you telling lies about me?"  (*Id.* at PageID.1016-17).

Shortly thereafter, Petitioner entered the residence and asked, "what's going on?" (*Id.* at PageID.1017-18).  Sullivan then heard "a gun shot" at which point Kendrick "fell down." (*Id.* at PageID.1018).  Sullivan did not see who shot Kendrick, but observed that Petitioner was the only person holding a gun.  (*Id.* at PageID.1018-19).  Petitioner then instructed Sullivan to move Kendrick's body from the house.  (*Id.* at PageID.1019).  Sullivan placed Kendrick's body in Petitioner's vehicle after which Petitioner drove away.  (*Id.* at PageID.1019-21).  The "girls"

that lived at 5985 Commonwealth "cleaned up the house" after Kendrick's body was removed. (*Id.* at PageID.1022-23).

**Patrick Nelson**

As of January 3, 1996, Nelson was employed as a police officer.   (ECF No. 189-5 at PageID.1026).   On this date, Nelson spoke with Deborah Sanders.   (*Id.*).   Sanders told Nelson about a shooting that occurred "at an address on Commonwealth."   (*Id.* at PageID.1027). Sanders told Nelson that the shooting in question was committed by a black male known as "Reverend."   (*Id.*).   Sanders further indicated that "Reverend" ordered her and Tanisha Kramer to "scrub the kitchen floor of the address on Commonwealth to get rid of the evidence."   (*Id.* at PageID.1028).   Sanders indicated that after Kendrick was killed, "Reverend" "[g]ave her drugs to stay high and keep her in the house so she would not leave or call the police."   (*Id.* at PageID.1028-29).

**Corine Cooks**

As of January 1, 1996, Cooks had been working as a prostitute at 5985 Commonwealth for approximately three months.   (ECF No. 189-5 at PageID.1034-35). Petitioner, who referred to himself as Reverend, also supplied Cooks with drugs.   (*Id.*).   Joe worked at 5985 Commonwealth to provide security.   (*Id.* at PageID.1035-36).

On January 1, 1996, a man named Al was at 5985 Commonwealth.   (*Id.* at PageID.1038-39).   At some point that evening, Al departed to purchase beer and crack cocaine. (*Id.* at PageID.1039).   When Al returned to the residence he began fighting with Joe.   (*Id.* at PageID.1039-42).   When Petitioner later entered the residence and observed this fight, Petitioner stated, with respect to Al, "I'm tired of this motherfucker coming over trying to take over the house."   (*Id.* at PageID.1042-43).   Petitioner then shot Al.   (*Id.* at PageID.1043-45).   Petitioner

4

later asked Cooks, "do you think you can handle it?," immediately adding, "if you can't handle it, I'll handle it for you."   (*Id.* at PageID.1049).

**Randy Richardson**

As of January 10, 1996, Richardson was employed as a Detroit Police Officer Evidence Technician.   (ECF No. 189-5 at PageID.1057).   On this date, Richardson conducted a search at 5985 Commonwealth.   (*Id.* at PageID.1057-58).   During this search, Richardson recovered a maroon-colored baseball hat and a pair of work gloves.   (*Id.* at PageID.1058-59). These items were located "inside of a trash dumpster next to the front porch."   (*Id.* at PageID.1059).   The baseball hat "had suspected blood" on it.   (*Id.* at PageID.1060).

**Marlene Irby**

Irby identified the baseball hat recovered by Richardson as belonging to Al Kendrick.   (ECF No. 189-5 at PageID.1060-61).

**Jason Kleinsorge**

As of January 8, 1996, Kleinsorge was employed as a Detroit Police Officer.   (ECF No. 189-5 at PageID.1062-63).   On this date, Kleinsorge was dispatched to investigate a body located in an alley.   (*Id.* at PageID.1063).   The body was frozen and "had what appeared to be a small caliber bullet wound over his left eye."   (*Id.* at PageID.1063-64).

**Ricky Harrison**

As of January 8, 1996, Harrison was employed as a Detroit Police Officer.   (ECF No. 189-5 at PageID.1069).   On this date, Harrison learned that a body had been discovered in an alley.   (*Id.*).   The following day, Harrison spoke with Marlene Irby.   (*Id.* at PageID.1070).   On January 11, 1996, Harrison spoke with Petitioner.   (*Id.* at PageID.1070-74).   Petitioner was

informed of his *Miranda* rights after which he agreed to speak with Harrison.   (*Id.* at PageID.1072-77).   In his statement to Harrison, Petitioner asserted the following.

On January 1, 1996, Al Kendrick contacted Petitioner to talk "about something that [Kendrick] was agitated about."   (*Id.* at PageID.1077-78).   Petitioner "begrudgingly" agreed to meet Kendrick at 5985 Commonwealth.   (*Id.* at PageID.1078).   When Petitioner arrived at this location, he observed Kendrick and Joe fighting.   (*Id.*).   Petitioner then shot his gun "into the air."   (*Id.*).   Petitioner "really could not believe that [Kendrick] was shot because [Petitioner] thought [he] had shot into the air."   (*Id.*).   Petitioner "just wanted to shoot and get their attention." (*Id.* at PageID.1079).   Once Petitioner realized that Kendrick was dead, Petitioner "panicked" and dumped Kendrick's body in an alley.   (*Id.*).

**Monica Childs**

As of January 12, 1996, Childs was employed as a Detroit Police Officer.   (ECF No. 189-6 at PageID.1102).   On this date, Childs interviewed Petitioner.   (*Id.*).   Childs informed Petitioner of his *Miranda* rights after which Petitioner agreed to speak with Childs.   (*Id.* at PageID.1102-03).   In his statement to Childs, Petitioner asserted the following.

Petitioner collected rent from the women who lived at 5985 Commonwealth.   (*Id.* at PageID.1106-07).   The women who resided there "all smoked crack and turned tricks."   (*Id.* at PageID.1107).   There "is a guy there named Joe who stays there off and on and he is the male presence, sort of a protector for the girls."   (*Id.*).   Al Kendrick "would hang out over there and smoke crack and he liked being around the girls."   (*Id.*).

When Petitioner entered 5985 Commonwealth on January 1, 1996, Joe and Kendrick were "arguing."   (*Id.*).   Neither Joe nor Kendrick were armed with a weapon.   (*Id.*). Petitioner "was trying to get their attention," but the pair "was still shouting back and forth."   (*Id.*).

Petitioner then fired his weapon "at a space over Al's head."   (*Id.*).   Petitioner then disposed of Kendrick's body by dumping it in an alley.   (*Id.* at PageID.1108).

**Schenvisky James**

As of January 1, 1996, Petitioner and Al Kendrick were friends.   (ECF No. 189-6 at PageID.1116-17).   On this date, Kendrick telephoned Petitioner and asked Petitioner to "come over to his house and pick him up."   (*Id.* at PageID.1117).   Kendrick "sounded agitated about something" and stated, "at this point I don't have nothing to lose."   (*Id.* at PageID.1117-18). Petitioner declined to pick up Kendrick, at which point Kendrick said he "was going to walk over to the house anyway."   (*Id.* at PageID.1118).   Petitioner later became concerned because he thought Kendrick "was going to hurt hisself or something."   (*Id.*).   Petitioner, therefore, decided to go to 5985 Commonwealth.   (*Id.*).

When Petitioner arrived at the house, one of the women informed him that "they're beating Joe."   (*Id.* at PageID.1118-19).   Petitioner then observed Kendrick exit the dining room with "a knife in his right hand."   (*Id.* at PageID.1119).   Kendrick attempted to say something to Petitioner, who responded by instructing Kendrick to "get the f- - - out of here."   (*Id.*).   Kendrick then "tried to take like a quick little step toward [Petitioner] and [Petitioner] shot the gun up in the air."   (*Id.*).   Petitioner, however, "never pointed that gun at Al," but was instead simply attempting to fire "a warning shot."   (*Id.*).   Petitioner "was very confused about what happened" because he "kn[e]w definitely for sure" that he did not shot Kendrick.   (*Id.* at PageID.1120). Petitioner then realized that "the bullet bounced off of the wall and hit Al, that's what they call a ricochet."   (*Id.*).

Petitioner also asserted that the statement he allegedly provided to Officer Childs was a fabrication.   (*Id.* at PageID.1123).   Petitioner conceded that he signed the statement in

7

question, apparently confirming its accuracy, but asserted that he did not have his eyeglasses at the time and, therefore, could not actually read the statement he was signing. (*Id.* at PageID.1123-26). Petitioner instead "trusted" Childs' description as to the statements' contents. (*Id.*).

**Monica Childs**

Officer Childs was recalled as a rebuttal witness. Childs reiterated that the statement about which she previously testified was comprised of Petitioner's statements to her. (*Id.* at PageID.1140-44). Childs further reiterated that Petitioner was afforded an opportunity to review his statement and make any additions or corrections thereto. (*Id.*). Finally, Childs testified that Petitioner never indicated that he was unable to read the statement in question because he did not have his eyeglasses. (*Id.*).

Following the presentation of evidence, the jury found Petitioner guilty of second-degree murder and possession of a firearm during the commission of a felony. (ECF No. 189-7 at PageID.1234-37). Petitioner was sentenced as a habitual offender to serve 23-40 years in prison on the second-degree murder conviction and two years on the possession of a firearm during the commission of a felony conviction. (ECF No. 189-8 at PageID.1279).

Petitioner initiated this matter in 2001, asserting numerous claims. (ECF No. 1, 11). This matter was stayed and administratively closed in 2004. (ECF No. 105, 117). The stay in the matter was lifted on March 10, 2017, after which the case was re-opened. (ECF No. 164). On August 22, 2018, James filed a second amended petition, (ECF No. 181), in which he asserts the following claims:

I.    Petitioner was denied appointment of appellate counsel on direct appeal.

II.   Petitioner's conviction is not supported by legally sufficient evidence.

III.  Petitioner's appeal of right was improperly dismissed.

IV.    The Michigan courts lack jurisdiction in this matter rendering illegal Petitioner's conviction and incarceration.

V.     The state courts refused to provide Petitioner with "unaltered" versions of the relevant trial transcripts.

VI.    Petitioner's waiver of his right to the assistance of appellate counsel was not voluntary, knowing, and intelligent.

VII.   The prosecutor engaged in misconduct thereby depriving Petitioner of the right to a fair trial.

## **STANDARD OF REVIEW**

James' petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.   The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).   As the Supreme Court recently emphasized, this standard is "intentionally difficult to meet."   *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (internal quotation omitted).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result."  *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists."  *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).   The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court.  *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams,* 529 U.S. at 411.   Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.   Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context."  *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308.   Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."   While this standard is "demanding" it is "not insatiable."   *Id.* For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007).   This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta."   *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue."   *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2).   This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"   *Harrington v. Richter*, 562 U.S. 86, 100 (2011).   Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits."   *Id.* at 99.   Where such is the case, the Court must

11

apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99-100.   If this presumption is overcome, however, the Court reviews the matter de novo.   *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## <u>ANALYSIS</u>

**I.**        **Procedural Default**

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address a petitioner's claims because of a failure to satisfy state procedural requirements.   *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).   Where a petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground precluding review by a federal court.   *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).   If a claim has been procedurally defaulted, federal habeas review is available only if the petitioner can establish (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that failure to consider the merits of the claim will result in a fundamental miscarriage of justice. *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004) (citing *Coleman*, 501 U.S. at 750).

12

Respondent argues that Petitioner failed to present any of his current habeas claims in state court and, therefore, has procedurally defaulted his habeas claims.   While there may be merit to Respondent's argument, the Court is not obligated to address such, but can instead simply decide Peterson's petition on the merits.  *See, e.g., Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (recognizing that "judicial economy" may justify addressing a habeas petition on the merits rather than addressing complicated procedural default questions).   Considering that several of Petitioner's claims concern his alleged inability to present his claims on appeal, the Court opts to simply address Petitioner's claims on the merits.   The Court finds that Respondent is not prejudiced by this approach, as Petitioner's claims are without merit.

**II.**        **Appellate Claims**   (Habeas Claims I, III, and VI)

While claims I, III, and VI of James' amended habeas petition are worded slightly differently, all three claims assert the same underlying issue, namely that Petitioner was deprived of the right to counsel on his appeal of right from his criminal conviction.   Before analyzing Petitioner's claims, however, it is first necessary to discuss the relevant procedural background.

A.        Background

Petitioner appealed his conviction and in August 1996, the State Appellate Defender Office was appointed to represent Petitioner.   (ECF No. 189-13 at PageID.1450, 1452). In February 1997, Petitioner himself filed in the trial court motions for new trial, Ginther hearing,[1]

---

[1] A *Ginther* hearing concerns a defendant's claim of ineffective assistance of counsel.  *See People v. Ginther*, 390 Mich. 436 (1973).

and Walker hearing.[2]   (ECF No. 104, Exhibit A-1).[3]   The court, however, rejected Petitioner's pleadings, informing Petitioner, "you are represented" and "this court will only hear matters brought by your lawyer during the pendency of [your] appeal."   (*Id.*).

On April 4, 1997, Petitioner moved in the trial court "to proceed pro per."   (ECF No. 189-13 at PageID.1461-63).   In his motion, Petitioner detailed the philosophical and strategic differences he and his appointed counsel were experiencing.   (*Id.*).   Petitioner asserted that, based upon his assessment of certain legal authority, his appellate counsel "was either incompetent in legal precedences (sic) of both the Court of Appeals and Supreme Court or else she was deliberately endeavoring to mislead Defendant/Appellant."   (*Id.* at PageID.1462-63).   Petitioner further observed that "he lacks confidence and trust in any attorney's motivation or sense of ethics to conscientiously protect your Defendant/Appellant's rights of due process as guaranteed by the US Const. VI Amendment."   (*Id.* at PageID.1463).   Accordingly, Petitioner moved the court to permit his appointed counsel to withdraw so that he could represent himself on appeal.   (*Id.* at PageID.1461-63).

On April 18, 1997, Petitioner sent a letter to his appellate counsel requesting that she withdraw her representation.   (ECF No. 32, Exhibit B).   Specifically, Petitioner informed his attorney that, "because of my lack of trust and our irreconcilable differences of opinion, I think this is the best for both of us."   (*Id.*).   That same day, Petitioner authored a letter informing the

---

[2]  A *Walker* hearing concerns a defendant's challenge to the admissibility of a confession.   *See People v. Walker*, 374 Mich. 331 (1965).

[3]  The Court has, to the greatest extent possible, cited to electronically submitted versions of certain record items. Nevertheless, many of the relevant items in the record are contained in pleadings submitted before the advent of the Court's electronic filing system.   In such instances, the Court must cite to the docket entry number and, if possible, exhibit number instead of the now more familiar PageID. citation.

trial judge that he had requested his appointed appellate counsel to withdraw.   (ECF No. 32, Exhibit C).   Petitioner's appellate counsel subsequently moved to withdraw her representation of Petitioner.   (ECF No. 181-1 at PageID.539).   Counsel's motion to withdraw was subsequently granted.   (*Id.*).

Petitioner, expressly stating that he was representing himself, then moved in the trial court for copies of all documents, including trial transcripts, relative to his criminal conviction. (ECF No. 189-13 at PageID.1458). Petitioner's motion was granted and on June 30, 1997, the court sent to Petitioner a copy of the court file regarding his conviction, including the trial transcripts.   (ECF No. 32, Exhibit E; ECF No. 189-22 at PageID.2258).[4]   Shortly thereafter, Petitioner (now representing himself) filed in the trial court a motion for new trial, a motion for Burton hearing[5], a motion for Ginther hearing, and a motion for bond pending appeal.   (Dkt. # 104, Exhibit A-9; ECF No. 189-13 at PageID.1527).

In November 1998, Petitioner filed in the Michigan Court of Appeals a motion to dismiss charges, a motion for a new trial, and a motion for bond pending appeal.   (ECF No. 189-13 at PageID.1498-1516).   The Michigan Court of Appeals, in orders dated February 11, 1999, and March 8, 1999, denied Petitioner's motions and instead remanded the matter to the trial court with instructions to "hear and decide [Petitioner's] motion for new trial/Burton hearing based on newly discovered evidence, motion for new trial/Ginther hearing based on ineffective assistance

---

[4] The Court notes that Petitioner previously received a copy of his trial transcripts.   (ECF No. 181-1 at PageID.515; ECF No. 189-13 at PageID.1456).

[5] A *Burton* hearing concerns a defendant's claim for relief based upon newly discovered evidence.   *People v. Burton*, 74 Mich. App. 215 (1974).

of counsel and motion for bond pending appeal" filed in the trial court in June 1997.   (ECF No. 189-13 at PageID.1527-28).

On March 12, 1999, the trial court conducted a hearing on Petitioner's various motions.   At the outset, the court appointed attorney William Winters to assist Petitioner as standby counsel.   (ECF No. 189-9 at PageID.1286-89).   Petitioner responded that he was "okay" with this arrangement, but that "at this point" he wanted to proceed on his own without Mr. Winters' assistance.   (*Id.* at PageID.1289).   The judge, however, informed Petitioner that "if you change your mind, you are free to do so."   (*Id.* at PageID.1289-90).   The hearing was then adjourned.

On April 23, 1999, the trial court reconvened and conducted a hearing on Petitioner's claim that his trial attorney had failed to render effective assistance.   As part of this hearing, the trial judge engaged in a lengthy discussion with Petitioner regarding his decision to represent himself on appeal.   (*Id.* at PageID.1305-19).   However, in light of Petitioner's strategy to pursue his claim of ineffective assistance of trial counsel without eliciting testimony from his trial counsel, the trial judge, in an apparent abundance of caution, decided to refer Petitioner for a competency examination to ensure that he was competent to waive his right to the assistance of counsel.   (ECF No. 189-9 at PageID.1301-35; ECF No. 189-13 at PageID.1533).

On June 4, 1999, the trial court reconvened to consider the issue of Petitioner's competency.   In finding Petitioner competent, the judge adopted the conclusions of the psychologist who had examined Petitioner, which were as follows:

> Mr. James is capable of understanding the nature and the object of the proceedings, he is aware of his position in the pending proceeding, and is capable of assisting and conducting, I suppose,

the Defense in a rational and reasonable manner, and delay would
not be expected to alter anything going on with him.

(ECF No. 189-10 at PageID.1340-41).

The trial court held hearings on June 25, 1999, and again on July 22, 1999, to

consider Petitioner's various motions.   (ECF No. 189-11 at PageID.1370-1419).   On September

9, 1999, the trial court issued an opinion resolving the various motions it was instructed by the

Michigan Court of Appeals to consider on remand.   (ECF No. 189-13 at PageID.1530-37).   In

denying Petitioner's motions, the court concluded as follows:

> The Court gave Mr. James over three opportunities on three separate
> occasions between April and July, 1999 to hold both *Ginther* and
> *Burton* hearings.   However, Mr. James repeatedly declined to
> proceed with either hearing.   Rather, Mr. James elected, clearly and
> unequivocally, to proceed on the trial record and not expand that
> record with any hearings.   Defendant stated he wished the matters
> to be decided on the record in the Court of Appeals, and voluntarily
> withdrew his motions for a new trial based upon Ginther and Burton
> hearings.
>
> The defendant was appointed with stand by counsel; was clearly
> informed of the Court of Appeals remand order; was determined to
> be competent to proceed as his own counsel; and, was fully informed
> of his right to hold both hearings and to call witnesses.   However,
> Mr. James declined to proceed with either hearing and withdrew his
> motions.
>
> The defendant having withdrawn his motions for a new trial based
> upon a Ginther and Burton hearings, the Court dismisses those
> motions.
>
> Defendant's Motion for Bond pending appeal is denied.

(*Id.* at 1536-37).

On December 29, 1999, Petitioner filed in the Michigan Supreme Court a motion

for the appointment of appellate counsel, as well as various motions challenging the November

22, 1999 decision by the Michigan Court of Appeals denying certain of his motions for failure to properly serve copies of such on the prosecuting attorney.   (ECF No. 48).   These motions were all subsequently denied.   (ECF No. 189-20 at PageID.1986).

At approximately this same time, Petitioner also filed in the Michigan Court of Appeals a motion for the appointment of appellate counsel.   (Dkt. #104, Exhibit A-22).   On January 13, 2000, the Michigan Court of Appeals informed Petitioner that if he wished to obtain court-appointed appellate counsel he must instead "file an appropriate motion with the trial court." (*Id.*).   Petitioner has neither presented nor identified evidence in the record that he complied with this instruction.   Petitioner's appeal was later dismissed for his failure to file a brief as directed by the Michigan Court of Appeals.   (ECF No. 32, Exhibit H; ECF No. 189-13 at PageID.1449; ECF No. 189-14 at PageID.1642).

B.    Analysis

An indigent criminal defendant enjoys the right under our Constitution to the appointment of counsel when pursuing an initial appeal of right.   *See Douglas v. California*, 372 U.S. 353, 354-58 (1963).   A criminal defendant can nevertheless choose to represent himself on appeal so long as that choice is knowing, voluntary, and intelligent.   *See Iowa v. Tovar*, 541 U.S. 77, 87-88 (2004) ("[w]hile the Constitution does not force a lawyer upon a defendant, it does require that any waiver of the right to counsel be knowing, voluntary, and intelligent").

Petitioner argues that he is entitled to relief because the state court failed to conduct a hearing dedicated to the issue of waiver of appellate counsel and, furthermore, failed to make specific findings on the record to support a determination that he properly waived his right to appellate counsel.   (ECF No. 181 at PageID.445-54, 466-69, 484-91).   Specifically, Petitioner

argues that for a waiver of counsel to be valid "there must be a record (i.e., a transcript record from a pre-waiver hearing) showing the defendant, appellant or Petitioner was 'warned about the dangers of self-representation so that he or she knew' what they were getting into with their 'eyes wide open.'" (ECF No. 181 at PageID.487).

The primary case on which Petiitoner relies is *Faretta v. California*, 422 U.S. 806 (1975). Anthony Faretta was charged with theft after which counsel was appointed to represent him. *Id.* at 807. When Faretta later moved to represent himself, the trial judge questioned Faretta about his request. *Id.* at 807-08. The judge granted Faretta's request, but reserved the right to "reverse this ruling if it later appeared that Faretta was unable adequately to represent himself." *Id.* at 808. The trial judge later conducted a hearing at which he questioned Faretta "about both the hearsay rule and the state law governing the challenge of potential jurors." *Ibid.* Dissatisfied with Faretta's responses, the trial judge reversed his decision and denied Faretta's request to represent himself. *Id.* at 808-10. A jury convicted Faretta who, following his unsuccessful state court appeals, moved the United States Supreme Court to hear the case. *Id.* at 811-12.

In its decision, the *Faretta* Court expressly stated that the question before it was limited to "whether a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so." *Id.* at 807. The Court answered this question in the affirmative following an extensive analysis. *Id.* at 812-34. After reaching this conclusion, the Court further observed:

> When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and

19

intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'

Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel.   The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will.   The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the 'ground rules' of trial procedure. We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.

In forcing Faretta, under these circumstances, to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right to conduct his own defense. Accordingly, the judgment before us is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*Id.* at 835-36 (citations and footnotes omitted).

Petitioner's argument is premised on the *Faretta* Court's observation that a criminal defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" As is recognized, however, this observation does not mandate that a finding of waiver be predicated upon any particular process or finding.  *See, e.g., Vreeland v. Zupan*, 906 F.3d 866, 877 (10th Cir. 2018) ("in *Faretta*, the Court held that the defendant's express statements were *sufficient* to waive the right to counsel and to invoke the right to proceed pro se.   But the Court didn't address whether such statements were *necessary* to yield that result"); *Knight v. Phillips*, 2012 WL 5955058 at *14 (E.D.N.Y., Nov. 28, 2012) ("[t]hat the Court went on to find that Faretta

did in fact knowingly and voluntarily waive his rights, citing trial court warnings in support of this finding, does not render such a finding necessary to the Court's answer to the question presented"). The Supreme Court has since confirmed that the language upon which Petitioner relies is mere dicta.  *See Tovar*, 541 U.S. at 88 ("[w]e have not, however, prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel").

Moreover, to the extent that *Faretta* is interpreted as mandating a certain procedure prior to finding a valid waiver of the right to counsel, the *Tovar* Court expressly limited such to the "waiver of *trial* counsel."  *Id.* at 88-89.  It would certainly not be unreasonable to require a more thorough and explicit inquiry in the context of a waiver of trial counsel.   The right a criminal defendant enjoys to self-representation at trial flows directly from the Sixth Amendment.  *See Faretta*, 422 U.S. at 818-20.   The Sixth Amendment, however, articulates rights that "are available in preparation for trial and at the trial itself" and "does not include any right to appeal." *Martinez v. Court of Appeal of California, Fourth Appellate District*, 528 U.S. 152, 159-60 (2000). Moreover, the dynamic between the state and the criminal defendant changes once a defendant moves from the trial stage to the appellate stage.  *Id.* at 162.   While a criminal trial is initiated by the state against a defendant who enjoys the presumption of innocence, a criminal appeal is usually initiated by a defendant "seeking not to fend off the efforts of the State's prosecutor but rather to overturn a finding of guilt made by a judge or jury below."  *Id.* at 162-63 (citation omitted).

In sum, whether a defendant's waiver of the right to counsel is knowing, voluntary, and intelligent "will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding."  *Tovar*, 541 U.S. at 88.   A defendant can waive the right to counsel "through

[his] conduct as well as though [his] words." *Ayers v. Hall*, 900 F.3d 829, 836 (6th Cir. 2018). Moreover, *Faretta* and its progeny do not preclude a court concluding that a criminal defendant waived his right to counsel impliedly rather than expressly. *See Vreeland*, 906 F.3d at 877. Petitioner bears the burden to establish that the waiver of his right to appellate counsel was not knowing, voluntary, and intelligent. *See Tovar*, 541 U.S. at 92 (in the context of a collateral attack, "it is the defendant's burden to prove he did not competently and intelligently waive his right to the assistance of counsel"). Petitioner has failed to meet his burden.[6]

First, with respect to Petitioner's employment, training, and education, the Court notes that Petitioner was employed as the "Head Quality Control Inspector" at Su-Dan, a manufacturing company. (ECF No. 181 at PageID.504-05). As a Su-Dan employee, Petitioner successfully completed a blueprint reading course and safety training courses concerning "hazardous energy" and "hazard communication." (ECF No. 181-1 at PageID.693). Petitioner was also a full-time nursing student at the University of Detroit Mercy earning a cumulative grade point average of 3.452. (ECF No. 181 at PageID.504-05; ECF No. 181-1 at PageID.687-89).

After being appointed counsel to represent him on appeal, Petitioner nonetheless filed in the trial court several motions for relief. After Petitioner was informed that his motions could not be considered because he was represented by counsel, Petitioner instructed his appointed counsel to withdraw and also moved the court to represent himself going forward. In so doing, Petitioner clearly articulated his dispute with counsel and his rationale for desiring to represent himself. Petitioner also identified the legal claims he wished to pursue, none of which were

---

[6] Moreover, even if Respondent bore the burden on this issue, the Court would reach the same result for the reasons articulated below.

unreasonable or fanciful.   Petitioner then proceeded to vigorously represent himself, filing several motions for relief in the trial and appellate courts.

As previously noted, counsel's motion to withdraw and Petitioner's motion to represent himself were granted in early 1997.   While the trial court did not conduct a hearing prior to granting these motions, the record supports a finding that Petitioner understood that he had been provided appointed counsel, but was declining such despite the risks inherent in such a strategy. That these motions were granted without first conducting a formal hearing or without eliciting from Petitioner any specific statement is not relevant.   *See, e.g., Ayers*, 900 F.3d at 835-36 (a criminal defendant "may waive [his] right to counsel through [his] conduct as well as through [his] words").   In sum, Petitioner cannot satisfy his burden to demonstrate that his request to represent himself in 1997 was not made knowingly, intelligently, and voluntarily.

This conclusion is further supported by Petitioner's responses when later questioned by the trial judge regarding his desire to represent himself.   At a March 12, 1999 hearing, Petitioner reiterated that he wanted to represent himself.   (ECF No. 189-9 at PageID.1282-89).   The court nevertheless appointed stand-by counsel to assist Petitioner, an arrangement with which Petitioner was satisfied.   (*Id.* at PageID.1286-90).

When the hearing on Petitioner's various motions reconvened on April 23, 1999, Petitioner reiterated that he wanted to represent himself and, furthermore, that he understood that the court would appoint an attorney to represent him, at no cost, if he so desired.   (*Id.* at PageID.1299, 1305-07).   Plaintiff indicated that he was satisfied with stand-by counsel and understood that he could enlist his assistance at any time and to whatever degree he desired.   (*Id.* at PageID.1307-19).   Plaintiff also expressed his understanding of the risks associated with

representing himself.  (*Id.* at PageID.1312-19).   Moreover, a subsequent examination found Petitioner competent to represent himself.   (ECF No. 189-10 at PageID.1340-41).

Petitioner was, therefore, permitted to represent himself and the court proceeded, over the course of three hearings, to address Petitioner's various motions.  (ECF No. 189-10 at PageID.1337-68; ECF No. 189-11 at PageID.1370-1445).   The Court discerns nothing during the course of these proceedings which calls into doubt the trial judge's determination that Petitioner's decision to waive his right to appointed counsel was anything other than knowing, intelligent, and voluntary.   Likewise, Petitioner has failed to identify anything in the record which suggests that his decision to represent himself was not voluntary, knowing, and intelligent.

Instead, Petitioner's claim is simply that the trial judge failed to conduct a particular type of hearing or make certain findings prior to permitting Petitioner to represent himself.   As already noted, however, the trial judge was not obligated to conduct any particular type of hearing or make any specific findings before granting Petitioner's request to represent himself.   Instead, the question is simply whether Petitioner's decision to waive his to appellate counsel was knowing, intelligent, and voluntary.   For the reasons discussed herein, Petitioner has failed to satisfy his burden.   Accordingly, habeas claims I, III, and VI are rejected.[7]

### III.        Illegal Conviction  (Habeas Claim IV)

Petitioner argues that he is entitled to relief because: (1) the state court lacked jurisdiction to conduct his trial, and (2) the state failed to initiate criminal charges against him in

---

[7] To the extent Petitioner argues that he was denied his right to appeal by the decision by the Michigan Court of Appeals to dismiss his appeal for his failure to file a brief, such claim is also rejected.   The court dismissed Petitioner's appeal for his failure to comply with Michigan rules and/or laws which cannot serve as a basis for habeas relief in this Court.   *See* 28 U.S.C. § 2254(a).   Moreover, Petitioner has identified no authority that warrants habeas relief where a defendant fails to prosecute his appeal in state court.

accordance with Michigan law.   (ECF No. 181 at PageID.469-79).   Petitioner's claim that the state court lacked jurisdiction to conduct his criminal trial is a matter of state law which is not cognizable in a federal habeas corpus proceeding.   *See Strunk v. Martin*, 27 Fed. Appx. 473, 475 (6th Cir., Nov. 6, 2001); *Milner v Hoffner*, 2017 WL 24793 at *10 (E.D. Mich., Jan. 3, 2017). Moreover, alleged deficiencies in the state's initial criminal proceedings are not cognizable in a federal habeas proceeding, as such alleged deficiencies do not undermine the validity of any subsequent conviction.   *See, e.g., Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) (the Court recognized "the established rule that illegal arrest or detention does not void a subsequent conviction").   Accordingly, this claim is rejected.

**IV.**        **Sufficiency of the Evidence**   (Habeas Claim II)

Petitioner argues that he is entitled to relief because his conviction for second degree murder is not supported by constitutionally sufficient evidence.   (ECF No. 181 at PageID.454-66).   Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.   *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury.   *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if

it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).   While Petitioner complains that the case against him was premised largely on circumstantial evidence, it must be remembered that "circumstantial evidence is entitled to the same weight as direct evidence" and "circumstantial evidence alone is sufficient to sustain a conviction." *United States v. Mack*, 808 F.3d 1074, 1080 (6th Cir. 2015).

Pursuant to Michigan law in effect as of January 1, 1996, an individual was guilty of second-degree murder if the following elements were satisfied: (1) a death; (2) caused by the defendant; (3) the killing was done with malice; and (4) without justification or excuse. *See People v. Porter*, 425 N.W.2d 514, 515 (Mich. Ct. App. 1988).   Malice is defined as "the intention to kill, the intention to do great bodily harm, or the intention to create a high risk of death or great bodily harm with knowledge that such is the probable result." *Ibid.*   Malice "can be inferred from the facts and circumstances of the killing." *Ibid.*   Malice may also be inferred from the defendant's "use of a dangerous weapon." *People v. Jordan*, 1997 WL 33350698 at *1 (Mich. Ct. App., Apr. 29, 1997) (citation omitted).

Viewing the evidence pursuant to the relevant standard compels the conclusion that the evidence supporting Petitioner's guilt was constitutionally sufficient.   The Assistant Medical Examiner testified that Al Kendrick died as a result of a single gunshot wound to the head. Deborah Sanders and Corine Cooks both testified that they witnessed Petitioner shoot Kendrick in the head.   Petitioner conceded shooting his weapon in Kendrick's vicinity.   This evidence satisfies the first three elements of the offense.   As to the fourth element, lack of justification or

excuse, Deborah Sanders testified that Kendrick did not threaten Petitioner before being killed. Accordingly, this claim is rejected.

V.        **Prosecutorial Misconduct**   (Habeas Claim VII)

Petitioner alleges that his right to a fair trial was violated by several instances of misconduct by the prosecuting attorney, each of which is explored below.  (ECF No. 181 at PageID.492-509).

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor."  *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219).  Thus, even if the challenged comments were improper, habeas relief is available only where the comments were "so flagrant as to render the entire trial fundamentally unfair."  *Gillard*, 445 F.3d at 897.  It must also be remembered that this Court "does not possess supervisory powers over state court trials" as "it is the responsibility of the state courts to police their prosecutors."  *Gordon v. Burt*, 2016 WL 4435355 at *11 (W.D. Mich., Aug. 23, 2016) (quoting *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).

27

A.    Lack of Jurisdiction

Petitioner first argues that he is entitled to relief because jurisdiction to prosecute him was lacking where the prosecuting attorney failed to file a criminal information in accordance with Michigan law.  (ECF No. 181 at PageID.493-94).   As noted above, claims that the state court lacked jurisdiction to conduct Petitioner's criminal trial, or that there existed deficiencies in the state's initial criminal proceedings, are not cognizable in a federal habeas corpus proceeding. Moreover, Petitioner has failed to demonstrate that the fairness of his trial was impacted by any events which preceded such.   Accordingly, this claim is rejected.

B.    Perjured Testimony

Petitioner next argues that he is entitled to relief on the ground that the prosecuting attorney knowingly elicited perjurious testimony from several witnesses.   To prevail on these claims, Petitioner must demonstrate: (1) the testimony was false; (2) the prosecutor knew it was false; and (3) the testimony was material.  *See Johnson v. Curtin*, 2017 WL 7790115 at *4 (6th Cir., Oct. 23, 2017) (citation omitted).   Moreover, the testimony "must be indisputably false, rather than merely misleading."   *Ibid.* (citations omitted).

1.    Corine Cooks

Petitioner alleges that at the preliminary examination,[8] Cooks testified that Al Kendrick was carrying a knife when he entered Petitioner's Commonwealth Street house on the night in question.  (ECF No. 181 at PageID.494-95).   Cooks allegedly further testified that she did not witness Kendrick set down the knife and could not discern if Kendrick was still holding

---

[8] The transcripts of Petitioner's preliminary examination were not submitted by Respondent.   The Court will, therefore, in the absence of evidence to the contrary, accept Petitioner's description of the relevant preliminary examination testimony.

the knife when Petitioner entered the residence.  (*Id.*).  At trial, Cooks testified that when Kendrick began fighting with Joe, Kendrick was carrying a knife.  (ECF No. 189-5 at PageID.1041-42).  Cooks then testified that after Petitioner entered the residence, she did not observe Kendrick carrying a knife.  (*Id.* at PageID.1042).  Cooks then agreed that it "would be fair to say at one point [Kendrick] had the knife and then later he didn't have the knife anymore." (*Id.*).

Petitioner alleges that Cooks' trial testimony is inconsistent with her previous preliminary examination testimony and that such establishes that the prosecutor violated his right to a fair trial by knowingly eliciting perjurious testimony.   First, Petitioner has failed to establish that Cooks' trial testimony was false.   Instead, Petitioner has established, at most, a slight inconsistency in her testimony.   Moreover, even if the Court assumes that Cooks' trial testimony was false, Petitioner has presented no evidence establishing that the prosecutor knew the testimony was false.   Accordingly, this claim is rejected.

2.    Deborah Sanders

Petitioner has submitted a copy of a witness statement allegedly signed by Sanders following an interview with a police investigator on January 21, 1996.  (ECF No. 181-1 at PageID.649).   According to this statement, Sanders told the investigator that when Petitioner entered the residence and confronted Al Kendrick, Petitioner asked Kendrick, "what's that for?" (*Id.*)   According to Petitioner, his question was in reference to a knife Kendrick was allegedly carrying at that moment.   (ECF No. 181 at PageID.495-96).   At trial, however, Sanders testified that when Petitioner confronted Al Kendrick with a gun, Kendrick asked, "what's that for?", referring to the gun.   (ECF No. 189-4 at PageID.971).

29

Petitioner argues that Sanders' trial testimony is inconsistent with her previous witness statement and that such establishes that the prosecutor knowingly elicited perjurious testimony at trial in violation of his right to a fair trial. Petitioner has failed to demonstrate that the testimony in question is false as opposed to merely inconsistent with her previous witness statement. Again, even if the Court assumes that Sanders' trial testimony was false, Petitioner has presented no evidence that the prosecutor knew that the testimony was false. Accordingly, this claim is rejected.

　　　　3.　　Lanning Davidson

As noted above, Davidson performed an autopsy on Al Kendrick's body. At trial, Davidson described the bullet which he extracted from Kendrick's brain as "a small caliber nonjacket bullet." (ECF No. 189-4 at PageID.949). According to Petitioner, at the preliminary examination, Davidson described this bullet as a "small caliber deformed non-jacketed bullet." (ECF No. 181 at PageID.496-99). Petitioner argues that the characterization of this bullet as "deformed" "is significant to the defense of accidental death due to a ricochet bullet." This may be the case, but all Petitioner has established is that Davidson's trial testimony was, at most, incomplete or inconsistent rather than false.[9] Moreover, even if the Court assumes that the testimony is question was false, Petitioner has presented no evidence that the prosecutor knew the testimony was false. This claim is, therefore, rejected.

---

[9] The Court notes that Petitioner explored this issue on cross-examination eliciting from Davidson testimony that the bullet in question was discovered in "fragments" (i.e., it was deformed).

4.    Suppression of Evidence

In the context of his various claims of prosecutorial misconduct, Petitioner advances the argument that the prosecutor improperly withheld exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  (ECF No. 181 at PageID.499-500).  Specifically, Petitioner asserts that the prosecution improperly withheld from the defense the following items: (1) a witness statement Deborah Sanders made to the Detroit Police on January 21, 1996; and (2) Lanning Davidson's report and notes concerning his autopsy of Al Kendrick.  (ECF No. 181 at PageID.499-500, 648-51, 656-62).

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Wilson v. Mitchell*, 498 F.3d 491, 512 (6th Cir. 2007) (quoting Brady, 373 U.S. at 87).  The material which must be disclosed under Brady "encompasses impeachment evidence as well as exculpatory evidence."  *Wilson*, 498 F.3d at 512 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

To establish a *Brady* violation, Petitioner must establish: (1) the prosecution suppressed or withheld evidence, (2) such evidence was favorable to the defense, and (3) the suppressed evidence was material.  *See United States v. Dado*, 759 F.3d 550, 559-60 (6th Cir. 2014).  Petitioner's claim fails, however, because Petitioner has no evidence that the information in question was, in fact, withheld from the defense.  *See, e.g., Gillard v. Mitchell*, 445 F.3d 883, 894 (6th Cir. 2006) (habeas petitioner "has the burden of establishing that the prosecutor suppressed evidence").  This claim is, therefore, rejected.

31

5.      Improper Argument

As previously noted, Petitioner asserts that he did not fire his weapon directly at Al Kendrick, but instead fired his weapon into the ceiling after which the bullet ricocheted and struck Kendrick.   Petitioner argues that he is entitled to relief because during closing argument the prosecutor attacked his ricochet theory.   (ECF No. 181 at PageID.500-03).   Specifically, the prosecutor argued that Petitioner's ricochet theory was "garbage" and "makes no sense" because it was contrary to the evidence.   (ECF No. 189-6 at PageID.1163-64).   Petitioner also complains about the prosecutor's closing argument regarding Corine Cooks' testimony that she "felt something hit [her] in [her] head" immediately after Petitioner fired his weapon.   (ECF No. 189-5 at 1052).   Regarding this testimony, the prosecutor stated in closing argument:

> That's the gunpowder, that's my explanation to you, the gunpowder that [Cooks] felt when she was standing right next to the defendant when he shot the weapon.   She said air or powder on her face and she ran upstairs.   That's where that comes from, not from this ricochet theory because it wasn't plast[er].   She would have said plast[er].

(ECF No. 189-6 at PageID.1176-77).

It is not inappropriate for a prosecutor to "highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence." *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005).   Likewise, the prosecutor is permitted to "point out the lack of evidence supporting [the defendant's] theories" of the case.   *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005).   Nevertheless, a prosecutor may not "make unfounded and inflammatory attacks on the opposing advocate," *United States v. Young*, 470 U.S. 1, 9 (1985), or "argue that counsel is attempting to mislead the jury."   *West v. Bell*, 550 F.3d 542, 565 (6th Cir. 2008).

32

The Court discerns nothing improper about the prosecutor's argument that Petitioner's ricochet theory was weak and inconsistent with the evidence.  First, aside from Petitioner's testimony that the bullet "bounced off of the wall," Petitioner has identified no evidence in support of his ricochet theory.   Petitioner asserts that there exists evidence that "traces of foreign material" were discovered on the bullet fragments removed from Al Kendrick's brain, thus supporting his ricochet theory.  (ECF No. 181 at PageID.503).   However, the evidence to which Petitioner cites contains nothing which establishes or even suggests that the bullet fragments removed from Kendrick's brain contained any "traces of foreign material."  (ECF No. 181-1 at PageID.669-76, 683-85).   Second, as the prosecutor reasonably argued, Petitioner's ricochet theory was inconsistent with Lanning Davidson's conclusion that the bullet which killed Kendrick was fired from a weapon which had been "held straight in front of Mr. Kendrick['s] forehead." In sum, the prosecutor's argument that Petitioner's ricochet theory was contrary to the evidence, as well as common sense, did not deprive Petitioner of a fair trial.

As for the prosecutor's comments concerning Corine Cooks' testimony referenced immediately above, the Court reaches the same conclusion.   Cooks testified that she was standing within arm's length of Petitioner when he fired his weapon.   (ECF No. 189-5 at PageID.1051-52). Cooks testified that immediately after Petitioner fired his weapon, she felt something "like air" or "like a powder" hit her in the head.  (*Id.* at PageID.1052).   Lanning Davidson testified that gunpowder residue would land on skin or objects located within two feet of the weapon when discharged.  (ECF No. 189-4 at PageID.947-48).   The prosecutor's argument that the material Cooks felt on her face immediately after Petitioner fired his weapon was gunpowder, rather that

ricochet residue, was entirely consistent with the evidence and, therefore, did not deprive Petitioner of a fair trial.   Accordingly, this claim is rejected.

       6.       Character and Other Bad Acts Evidence

Finally, Petitioner argues that his right to a fair trial was violated when the prosecuting attorney argued that Petitioner only pretended to be a Reverend and was instead a pimp and drug dealer.  (ECF No. 181 at PageID.503-09).   Corine Cooks testified that Petitioner referred to himself as "Reverend," but was not, in fact, a Reverend.  (ECF No. 189-5 at PageID.1034).   Cooks further testified that Petitioner supplied her with drugs.  (*Id.* at 1034-35).  Marlene Irby testified that other people used drugs at Petitioner's Commonwealth Street house.  (ECF No. 189-3 at PageID.928-29).   Deborah Sanders testified that she lived at Petitioner's Commonwealth Street house and paid her rent by engaging in acts of prostitution.  (*Id.* at PageID.959-60).   Given this evidence, it was reasonable for the prosecutor to point out to the jury that Petitioner was "not really a Reverend" and, moreover, that Petitioner was aware of the drug use and prostitution occurring in his house.  (ECF No. 189-6 at PageID.1166-67).   This claim is, accordingly, rejected.

**VI.**       **Trial Transcripts**  (Habeas Claim V)

Petitioner argues that his right to appeal his conviction was denied by the State's failure to provide him with "unaltered trial transcripts" as well as transcripts of the various post-conviction proceedings before the trial court discussed above.  (ECF No. 181 at PageID.479-84).

       A.       Accurate Trial Transcripts

As noted above, contemporaneous with the granting of Petitioner's request to represent himself on appeal, the trial court provided Petitioner with copies of the court file

including trial transcripts.   Petitioner argues that these transcripts, however, were inaccurate. The Court "must presume that the trial transcript accurately reflects the proceedings in the trial court."   *Thomas v. McKee*, 2016 WL 213021 at *23 (E.D. Mich., Jan. 19, 2016); *Norris v. Schotten*, 146 F.3d 314, 333 (6th Cir. 1998) (in a habeas proceeding speculation is insufficient when challenging the accuracy of trial transcripts); *Harris v. McBride*, 2014 WL 2738574 at *4 (N.D.W.V., June 17, 2014) (recognizing, in the context of a habeas action, that "[t]he fact that the petitioner disagrees with what is contained in a transcript is insufficient to overcome the presumption of the transcript's accuracy").

The trial transcripts in this matter are all certified accurate by the court reporter. (ECF No. 189-4 at PageID.983; ECF No. 189-5 at PageID.1097; ECF No. 189-6 at PageID.1222; ECF No. 189-7 at PageID.1240).   Aside from identifying a single instance in the transcript where the name "Aaron" was misspelled "Erin," Petitioner offers nothing but unsubstantiated speculation in support of his claim.   Having failed to overcome the presumption of correctness applicable to the trial transcripts, Petitioner's claim is rejected.

B.    Failure to Provide Transcripts of Post-Conviction Proceedings

Petitioner also argues that he is entitled to relief because his right to appeal was denied by the State's failure to provide him copies of the transcripts of the various post-conviction hearings discussed above.   To prevail on a claim of "denial of a fair appeal," Petitioner "must show prejudice resulting from the missing transcripts."   *Winkler v. Parris*, - - - F.3d - - -, 2019 WL 2509298 at *4 (6th Cir., May 8, 2019).   Other than repeating the bare assertion that he suffered prejudice because he was not provided copies of the transcripts in question, Petitioner has failed to establish the requisite prejudice.   Accordingly, this claim is rejected.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that James' petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000); *Miller-El*, 537 U.S. at 336.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: July 9, 2019                                     /s/ Ellen S. Carmody
                                                       ELLEN S. CARMODY
                                                       United States Magistrate Judge